AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>512 W. San Miguel Street, Colorado Springs, Colorado,<br>more fully described in Attachment A | ) ) ) ) ) ) Case No. 20-sw-01428-NRN |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE "ATTACHMENT A", which is attached to and incorporated in this Application and Affidavit

located in the _____ District of __Colorado__ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE "ATTACHMENT B", which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of and Possession with Intent to Distribute a Controlled Substance |
| 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/ Andrew Cohen
*Applicant's signature*

Andrew Cohen, Special Agent, FBI
*Printed name and title*

Sworn to and subscribed by reliable electronic means.

Date: 11/25/2020

*Judge's signature*

City and state: Denver, Colorado

Hon. N. Reid Neureiter, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### DESCRIPTION OF LOCATION TO BE SEARCHED

512 W. San Miguel Street, Colorado Springs, Colorado



The residence at 512 W. San Miguel Street, Colorado Springs, Colorado is single-family residence. The residence is an off green color with white trim and a green door. The numbers 512 appear to the right of the door. The premises to be searched includes the residence and all rooms, attics, basements, storage areas, floors, walls, and combination safes, lockers and lock boxes, briefcases, containers, trash containers, surrounding grounds, garage, and outbuildings assigned to or part of this particular property. The premises to be search also includes vehicles associated with occupants of the residence which are present on the premises at the time of the search and the persons of adults located at the premises at the time of execution of this search warrant.

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED FOR

The following items, that constitute evidence of the commission of criminal offenses; contraband, the fruits of crimes, and things otherwise criminally possessed; and property designed or intended for use or which is or has been used as the means of committing criminal offenses, namely, violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances and possession of controlled substances with the intent to distribute); 21 U.S.C. § 846 (conspiracy to distribute controlled substances); ans 18 U.S.C. § 922(g)(1) (felon in possession of a firearm), particularly the following:

1. Controlled substances, including methamphetamine;

2. U.S. currency obtained during a controlled purchase operation on November 24, 2020;

3. Items known to be used in the distribution of illegal drugs, including scales, plastic baggies, and cash counters;

4. Firearms, ammunition, firearms accessories, and records related to the ownership of such items and any items found near any firearms or ammunition tending to show who possessed and controlled them;

5. Any documents related to or used to assist in the procurement or distribution of controlled substances, including notes, customer lists, supplier lists, correspondence, and ledgers;

6. Evidence of the identity of co-conspirators, suppliers of controlled substances, and purchasers of controlled substances, such as telephone and address books, telephone bills or toll records, diaries, ledgers, journals, papers, caller identification devices, cellular telephones, telephone records, and electronic rolodexes;

7. Cash, currency, financial instruments, and/or records relating to the laundering, secreting, and/or distribution of monies related to the proceeds of procuring or distributing of controlled substances, and any and all financial documents and records which may evidence financial transactions relating to obtaining, transferring, laundering, secreting or spending the proceeds of the sale of controlled substances;

8. Photographs showing controlled substances or firearms and people in possession of controlled substances or firearms, including on cell phones and other digital storage devices;

9. Any safe deposit box keys, storage keys, or records pertaining to safe deposit boxes or storage units or areas where controlled substances may be located;

10. Indicia of ownership or occupancy of the searched property and items seized;

11. Cellular telephones, or other electronic devices capable of communicating with others about controlled substances or firearms, taking photographs, and/or connecting to the internet.

# AFFIDAVIT IN SUPPORT OF AN APPLICATION
# FOR A SEARCH WARRANT

I, Andrew Cohen, being first duly sworn, hereby depose and states as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the FBI, and have been since 2014. I am currently assigned to the Denver Division of the FBI, and specifically to the Southern Colorado Safe Streets Task Force. I investigate drug trafficking in the normal course of my duties, and I am fully familiar with the facts of the case. During the course of my career, I have been an affiant on several Title III wiretap affidavits related to narcotics, and I have participated in several narcotics investigations involving controlled substances, including, but not limited to, heroin, cocaine, marijuana, and methamphetamine. I also have investigated individuals in other cases involving violent gang related crimes, controlled substances and the possession of firearms by prohibited persons.

2. I have additional training and experience including but not limited to debriefing and interviewing of informants and criminal subjects, conducting physical surveillance, writing affidavits for the purposes of obtaining search warrants and criminal complaints, working with undercover Police Officers and Federal Agents, analyzing phone data, and reviewing social media accounts.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Particularly, much of the information in this affidavit came from Colorado Springs Police Department (CSPD) Detectives.

4. In sum and as set forth below, my investigation to date reveals probable cause to believe that David Hanley unlawfully possesses a firearm, and is involved in a drug conspiracy. Indeed, over the last several months Hanley sold methamphetamine to a CSPD Detective operating in an undercover capacity (hereinafter the "UC").  Most recently, on November 24, 2020, Hanley took over $4,000 in U.S. currency from the UC, but did not provide the methamphetamine.  From Hanley's point of view, he essentially robbed the UC.

5. Based on my training and experience and the facts set forth in this affidavit, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute a controlled substance), 846 (conspiracy to distribute controlled substances), and 18 U.S.C § 922(g)(1) (possession of a firearm by a felon) (hereinafter "THE TARGET OFFENSES"), will be found at 512 W. San Miguel, Colorado Springs, Colorado (hereinafter "THE TARGET LOCATION").

6. This property is more fully described in and shown in a photograph in Attachment A. I respectfully request the issuance of a warrant to search the property described in Attachment A for evidence, fruits, and instrumentalities of violations of THE TARGET OFFENSES identified with particularity in Attachment B.

1

# FACTS IN SUPPORT OF PROBABLE CAUSE

### *Background Information Regarding David Hanley*

7. David Hanley (date of birth 03/XX/1978) a/k/a "Cutty" resides at THE TARGET LOCATION.  Hanley is a seven-time convicted felon, and is currently residing in Colorado Springs, Colorado.  I have reviewed a criminal history for Hanley, and learned the following information related to his felony convictions.

 a. In El Paso County Case 1997CR2933, Hanley pled guilty on 09/15/1997 to Theft By Receiving, a Class 4 Felony, and was given a three year deferred sentence that was ultimately revoked (see Denver County Case 2000CR1031).

 b. In Denver County Case 2000CR1031, Hanley pled guilty on 06/26/2000 to Criminal Mischief, a Class 5 Felony, and was sentenced to four years of community corrections.

 c. In Adams County Case 2005CR2131, Hanley pled guilty on 12/01/2005 to Possession of a Controlled Substance, a Class 6 Felony, and was sentenced to one year Colorado Department of Corrections.

 d. In El Paso County case 2009CR1726, Hanley pled guilty on 07/29/2010 to Robbery, a Class 5 Felony, and was sentenced to ten years Colorado Department of Corrections.

 e. In El Paso County Case 2009CR1975, Hanley pled guilty on 07/29/2010 to Possession of a Controlled Substance, a Class 2 Felony, and was sentenced to ten years Colorado Department of Corrections.

 f. In El Paso County Case 2015CR877, Hanley pled guilty on 06/03/2015 to Possession of a Controlled Substance, a Class 4 Drug Felony, and was sentenced to nine months Colorado Department of Corrections.

 g. In El Paso County Case 2018CR7457, Hanley pled guilty on 01/30/2020 to Possession of a Controlled Substance, a Class 2 Drug Felony, and was sentenced to four years of probation with a sixteen year deferred sentence.

### *An Undercover Officer Is Introduced to Hanley*

8. Law enforcement, including the FBI and the CSPD, have conducted prior narcotics investigations where Hanley has been named as a source of supply for methamphetamine and other controlled substances.

9. In the summer of 2020, the UC began purchasing methamphetamine from Defendant 1.  Defendant 1 was purchasing methamphetamine from Defendant 2.  I have omitted Defendant 1's and Defendant 2's names and identifying information to protect their privacy.

10. During one of the transactions with Defendant 1, the UC suspected that Hanley was the ultimate source of supply but was unable to positively identify him.  Specifically, at an UC

purchase of methamphetamine on July 30, 2020, the UC observed a Nissan Armada bearing Colorado temporary license plate 2122072 at the location of the methamphetamine purchase. Defendant 1 obtained methamphetamine from Defendant 2, who obtained the methamphetamine from the driver of the Armada.

11. The Armada registered to David Hanley at THE TARGET LOCATION. The UC suspected the driver of the Armada was Hanley based upon observations from other Detectives conducting surveillance at the time, and Hanley's prior booking photos.

12. As the investigation progressed, Defendant 2 told the UC that "Cutty" was his source of supply. The UC was familiar with Hanley's moniker of "Cutty." Defendant 2 ultimately introduced the UC to "Cutty" in August of 2020.

13. When the UC met "Cutty" for the first time, "Cutty" was driving a black Acura MDX with Colorado license plate CCA764 which registered to Heather Martin and Edward Martin at 4125 Galley Rd, Apt 309, Colorado Springs, Colorado.

### *UC Purchase of Methamphetamine on October 1, 2020, and Discussion of a Firearm*

14. On or about October 1, 2020, the UC contacted Hanley by telephone to discuss the sale of methamphetamine. These conversations were audio recorded. Hanley agreed to meet the UC to exchange $450 for approximately one ounce of methamphetamine.

15. Hanley arrived at the pre-determined meeting location in a 2008 BMW sedan bearing Colorado temporary permit 2324504, which registered to Isiah Alvaran, 720 East Hills Road, Apt D, Colorado Springs, Colorado.

16. Hanley completed the exchange of methamphetamine for cash. Detectives later weighed the suspected methamphetamine, and found it had a packaged weight of 28.92 grams. Detectives also conducted a field narcotics test, which returned a presumptive positive result for the presence of methamphetamine.

17. During the narcotics transaction, Hanley mentioned that he owned a Smith and Wesson M&P .40 and described in detail his AR style rifle. The UC, who carries a Smith and Wesson M&P firearm in the daily course of his duties, and is a firearms instructor, knows that ".40" actually refers to a .40 caliber handgun. This conversation between the UC and Hanley was audio recorded.

18. I know from my training and experience in prior narcotics investigations that drug dealers often times possess firearms to protect themselves, and tend to keep those firearms on their person and in their residence. Often times, when firearms are recovered in narcotics investigations, there is ammunition and other evidence of the acquisition of the ammunition or firearm.

### *UC Purchase of Methamphetamine on October 7, 2020, and Display of a Firearm*

19. On October 6, 2020, the UC contacted Hanley via telephone to arrange the purchase of a quarter pound of methamphetamine for $1,600. They agreed to meet the following day.

20. On October 7, 2020, physical surveillance was initiated at THE TARGET LOCATION. Investigators observed Hanley leave THE TARGET LOCATION and depart in the aforementioned BMW sedan.

21. Hanley arrived at the pre-arranged meeting location with an unknown Hispanic male who identified himself as "Filthy." The UC exchanged $1,600 for a plastic baggie containing a white crystalline substance, which later field tested presumptively positive for the presence of methamphetamine.

22. At the end of the transaction, "Filthy" removed a black semi-automatic handgun from underneath the front passenger seat and put it into a backpack. "Filthy" stated it was a .40 caliber. I know from my training and experience that drug dealers will display firearms at these types of transactions with the intent to intimidate their customers, and believe that through that intimidation, they might mitigate the risk of being robbed by their customers.

23. The UC did not believe the semi-automatic handgun displayed was a Smith & Wesson M&P. It is unknown if the firearm belonged to "Filthy" or Hanley.

24. Physical surveillance was continued after the narcotics transaction. Hanley and "Filthy" ultimately returned to THE TARGET LOCATION approximately seven minutes later.

25. Investigators believe "Filthy" is actually Philippe Luna (date of birth 01/##/1987). Luna has two prior felony convictions in El Paso County, including motor vehicle theft, and felony menacing with a real or simulated weapon.

### *Hanley "Robs" the UC of $4,700 on November 24, 2020*

26. On November 24, 2020, the UC contacted Hanley via telephone to purchase one pound of methamphetamine for $4,700. As with the two previous transactions, Hanley and the UC agreed to meet at a specific location. Hanley had requested that the UC give him a ride to his source of supply to pick up the larger quantity of methamphetamine.

27. When the UC arrived at the location, Hanley approached the UC's vehicle. Hanley stated he needed all the money upfront, and had to go inside an apartment to purchase the pound of methamphetamine. The UC complied with Hanley's request and gave him the $4,700.

28. Hanley never returned with the methamphetamine and would not answer or return calls or text messages from the UC.

29. The serial numbers of the $4,700 that was provided to Hanley were pre-recorded, and if recovered at THE TARGET LOCATION, investigators would be able to identify the exact bills based on this information.

### *Confirmation that Hanley Resides at THE TARGET LOCATION*

30. On November 24, 2020, CSPD Detective G. Stilley was conducting physical surveillance at THE TARGET LOCATION, and observed Hanley enter the front door of the residence. Detective Stilly has been involved in prior investigations related to Hanley, and has previously debriefed Hanley at length. This is significant because Detective Stilley recognized Hanley, and was able to positively identify him.

31.     I was also able to review information from the Colorado Department of Motor Vehicles, specifically related to Hanley's Colorado Driver's License.  Hanley's Driver's License (although suspended for nonpayment of child support), was issued on 08/12/2020 and lists THE TARGET LOCATION as his address.

32.     I was also able to review court records from Hanley's most recent El Paso County Court Case 2020CR2647.  In those records, I learned Hanley gave THE TARGET LOCATION as his address.

33.     Also during the end of November 2020, the BMW Hanley used to travel to the drug transaction on October 7, 2020, was seen parked in front of THE TARGET LOCATION.

34.     I submit that based on the physical surveillance mentioned above, Hanley's Driver's License information, and Hanley's 2020 court records; he does indeed reside at THE TARGET LOCATION.

### *Modus Operandi of Drug Traffickers and Drug Trafficking Organizations*

35.     I have experience, training, and communication with other law enforcement personnel who specialize in the area of illegal drug trafficking and the detection and documentation of proceeds from drug trafficking.  I also have experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations.  Such individuals often have personal knowledge regarding the methods, transportation, and distribution of the drugs and money in large scale controlled substance distribution operations.

36.     I know, based on training and experience, as well as from information relayed to me during the course of my official duties:

   a.     That a significant percentage of methamphetamine and heroin sold in the United States is produced outside of the United States, primarily in Mexico, and is then transported to various cities throughout the United States for retail distribution. Furthermore, I know that the importation, transportation, and distribution of methamphetamine are sometimes controlled by a number of well-organized and sophisticated drug trafficking organizations and gangs.

   b.     That members of these organizations routinely utilize communication facilities including cellular telephones calls, electronic text messaging, and messaging applications accessible on cellular telephones, to communicate with other organization members in furtherance of their illegal goals.  During the course of these electronic communications, organization members commonly use coded language and references and/or encryption in an effort to elude law enforcement detection. Based on training and experience, I know that narcotics traffickers commonly use multiple, prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement, and said traffickers also change cellular phones frequently or use multiple cellular phones to avoid detection by law enforcement officials.

   c.     That drug dealers use cellular phones and other communication devices, in which they maintain names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

5

d. That drug traffickers store information pertaining to drug trafficking activities on electronic devices, including cell phones, computers, and removable storage media. I further know, based on my training and experience, as well as from information relayed to me during the course of my official duties, that drug traffickers often retain, for long periods of time, such electronic documents and devices, in order to maintain a record of contacts, accounts, income, expenditures, assets, and drug-related debts.

e. That narcotics traffickers routinely "rotate" electronic devices, including cell phones, in order to avoid detection by law enforcement. For example, a narcotics trafficker may possess multiple cell phones and alternate the use of the cell phones on a weekly or monthly basis, before rotating to another cell phone. Based on training and experience, I know that narcotics traffickers often retain possession of previously-used cell phones, even though such phones are no longer utilized in furtherance of narcotics trafficking. Based on training and experience, I know that, while such phones may no longer be used for narcotics trafficking activities, the devices often contain electronic data, including call records, contact information, text messages, email, photos, video, and more, which can be evidence of past criminal activity.

f. That when drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, cashier's checks, money orders, wire transfers, and the like. Based on training and experience, I know that evidence of such financial instruments, accounts, and other methods of "laundering" drug proceeds may be stored on digital devices, such as cell phones and computers. I further know that narcotics traffickers often store electronic copies of records and receipts to such financial transactions on digital devices, such as cell phones. My colleagues and I have seen, for instance, photographs of money orders, tracking numbers, and cash.

g. That it is common practice for large scale narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotics traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, buses, and rental and private automobiles. I further know that narcotics traffickers often store electronic copies of records and receipts to such travel on digital devices such as cell phones. Similarly, geolocation information stored on devices also may reveal travel and patterns of travel material to the distribution of the controlled substances to obtain and redistribute.

h. That drug traffickers take or cause to be taken photographs or videos of themselves, their associates, their property, and their product; and that these traffickers often maintain these electronic images stored on digital devices such as cell phones. One purpose for doing so appears to be to show and confirm they are in possession of the product they seek to distribute.

i. That drug traffickers maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment rental agreements, cell phone bills, passports, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations. I further know that narcotics traffickers often store

digital versions of such documents in electronic devices such as cell phones.  My colleagues and I are also aware that more and more commonly such records exist only in electronic form as people more generally move from paper to electronic records to conduct the daily affairs of their life.

       j.      There are many reasons why drug traffickers maintain digital evidence for long periods of time. The evidence may be innocuous at first glance (e.g., electronic versions of financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, videos and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, records relating to safe deposit boxes, and computer hardware and software), but have significance and relevance when considered in light of other evidence. The drug trafficker may no longer realize he/she still possesses the evidence on a digital device or may believe law enforcement could not obtain a search warrant to search the device and seize the evidence. The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any evidence stored on a digital device. However, that evidence may still be retrievable by a trained forensic computer expert.

       k.      That drug traffickers are increasingly using computer hardware and software to communicate with co-conspirators and to facilitate the financial transactions associated with both the narcotics deals themselves and with the laundering of the related proceeds. Computer hardware and software may contain spreadsheets of suppliers and buyers, financial records, bank account records, criminal contacts and other information relevant to the investigation of the criminal enterprise.

       l.      Finally, I am aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects:  (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).  Rule 41, Fed.R.Crim.P., permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime.

### *CONCLUSION*

37.      For the reasons stated above, probable cause exists to believe that Hanley and others both known and unknown are engaged in the illegal distribution of controlled substances, namely methamphetamine.  Hanley sold methamphetamine to the UC on two separate occasions.  Hanley told the UC that he possessed firearms, specifically a .40 caliber handgun and an AR style rifle.  Hanley and "Filthy" brought a semi-automatic handgun to a drug transaction on October 7, 2020.

38.      Hanley lists THE TARGET LOCATION as his residence on his Driver's License and in his court records.  Hanley went to the illegal drug deal with the UC on October 7, 2020, from THE TARGET LOCATION and returned to THE TARGET LOCATION immediately after that drug deal.  Hanley was seen entering THE TARGET LOCATION as recent as November 24, 2020.

39. Based on the facts set forth above, I submit probable cause exists to believe evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute a controlled substance), 846 (conspiracy to distribute a controlled substance), and 18 U.S.C. §922(g) (felon in possession of a firearm) exist within THE TARGET LOCATION, described more fully in Attachment A.   Therefore, I request permission to search the property identified in Attachment A for the evidence, fruits, and instrumentalities identified with particularity in Attachment B.

*s/Andrew Cohen*
Andrew Cohen
Special Agent, Federal Bureau of Investigation

Sworn to and subscribed by reliable electronic means this __25th__ day of November, 2020.

_____
HON. N. REID NEUREITER
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

**This affidavit was reviewed and submitted by Peter McNeilly, Assistant United States Attorney.**

8